IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 10, 2015


**RANDALL K. MADISON v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Davidson County**
**No. 2008D4188     Mark J. Fishburn, Judge**

_____


**No. M2014-01942-CCA-R3-PC – Filed December 29, 2015**

_____


The petitioner, Randall K. Madison, appeals the denial of his petition for post-conviction relief. Following merger of alternative offenses, the petitioner stands convicted of twelve counts of rape and one count of forgery. For these convictions he received an effective sentence of thirty-five years in the Department of Correction. On appeal, he contends that it was error to deny his petition for relief because he was denied his right to the effective assistance of counsel. Following a thorough review of the record before us, we affirm the judgment of the post-conviction court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Elaine Heard, Nashville, Tennessee, for the Appellant, Randall K. Madison.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the Appellee, State of Tennessee.


**OPINION**


**Factual Background and Procedural History**

The facts underlying the petitioner's convictions, as recited by this court on direct appeal, are as follows:

At trial, the victim testified that he was currently nineteen years old and that he lived with his mother, T.D. The victim has a younger brother and a younger sister whom his mother adopted several years earlier after foster-parenting them. The victim explained that his father lived in Antioch but that he had contact with his father only "now and then."

The victim testified that he was active in his church, which he had been attending his "whole life." He met the [petitioner] through church when he was in the eighth grade. The [petitioner] became a friend of the family and acted as "a mentor to [the victim] and the other youth in the church." The victim started spending time with the [petitioner] outside of church, including attending the [petitioner's] family functions, going to movies, and going out to eat. When T.D. began traveling overnight for her job, she suggested the victim spend those nights with the [petitioner] because she did not want the victim staying at home by himself.

According to the victim, the [petitioner] lived by himself in a two bedroom house. The first night the victim spent with the [petitioner], he was fourteen years old and a freshman in high school. It was a Monday night in the early fall of 2004, and they watched football together. After the game, the victim went to bed in the second bedroom. During the night, the victim woke up to find the [petitioner] "on top of [him] with his back facing [him]." The victim explained that the [petitioner] was "moving," which the victim described as "grinding back and forth." The victim stated that his (the victim's) shorts were on, but that his "privates were out." The victim described their contact as "[s]kin to skin." When asked where his "privates" were in relation to the [petitioner's], the victim responded, "[i]n his anal region." When the [petitioner] realized the victim had awakened, the [petitioner] left the room. The victim then got up, went to the bathroom, and went back to sleep. The next day, the [petitioner] took the victim to school "as if nothing happened." They did not speak about the incident.

The victim returned home that afternoon because his mother was back from her trip. He did not say anything to her about what had happened. The victim explained his silence: "Because my mother, she's the type that when it comes to her children, she doesn't play. She will take

2

a life for her children.  And if I would have told her what happened, she would have taken his life."  The victim told no one else about the incident.

The victim continued seeing the [petitioner] as before and did not change his conduct toward the [petitioner] because he was concerned that people would "question" a change in his behavior.  Roughly a month later, his mother went out of town again and again suggested that he spend the night with the [petitioner].  The victim testified that he did so because he "didn't have anywhere else to go."  The victim testified that, as occurred previously, he awoke to find the [petitioner] straddling him.  When the victim asked him what he was doing, the [petitioner] did not reply but left the bedroom.  The victim stated that, during the encounter, his penis was in the [petitioner's] anus.  The next morning, nothing was said and the [petitioner] took the victim to school.  The victim testified that he had not consented to this behavior on either occasion.

The victim spent five to seven additional nights with the [petitioner] during the ninth grade (2004-2005), but nothing more occurred that school year.

Also during his freshman year, and continuing through his sophomore year (2005-2006), the victim frequently would meet the [petitioner] after school at the [petitioner's] place of employment in downtown Nashville.  On the afternoon of May 9, 2005, while the victim was still a freshman, the victim told the [petitioner] that he wanted to use the [petitioner's] work computer to look for a summer job.  Instead of looking for a job, however, the victim used the [petitioner's] work computer to visit a pornographic web site ("the Computer Incident").  The [petitioner] later confronted him about what had happened, explaining that his office had scanned the computer and discovered the visit to the website.  The victim acknowledged what he had done, and the victim subsequently spoke with Dr. Pinnock, the [petitioner's] supervisor, about his activities.  The victim acknowledged to Dr. Pinnock that he had used the computer for this purpose, and "signed some paperwork saying that [he] did it and that [he] agreed that it wouldn't happen again."  The victim "thought that was the end of it."  The paperwork that the victim signed was admitted into evidence. . . .

. . . .

3

That summer of 2005 between the victim's freshman and sophomore years, the victim was engaged in volunteer activities and spending time with his family in Mississippi, so he did not see the [petitioner]. Their relationship resumed with the new school year, however. During a weekend early in the new school year (the fall of 2005), the victim was again spending the night with the [petitioner] because the victim's mother was out of town. The [petitioner] brought up the Computer Incident and told the victim that the [petitioner] "could lose his job" and also that the victim "could go to jail for no less than seven years [because he had] looked up pornography on a State computer." At this time, the victim's mother was in the process of trying to adopt the victim's younger brother and sister. The [petitioner] pointed out to him that if he (the victim) went to jail, he would not be available to help his mother with the children. This disturbed the victim because he "would do anything" for his mother. He told the [petitioner],

> no, no, no, you can't send me to jail. You can't send me to jail. I have to be here for my mother. I have to help her raise these two kids. I'm the oldest in the house. I really need to – she really needs me to help her with these kids.

He testified that he "was basically begging [the petitioner] not to send [him] to jail."

After this conversation, the victim went to take a shower. While he was in the shower, the [petitioner] entered the bathroom and got in the shower with him. The victim assumed that the [petitioner] wanted sex and also assumed that he had to acquiesce to the [petitioner's] wishes in order "to be here for [his] mother and these kids." However, all the [petitioner] did was wash the victim's body.

In addition to this weekend, the victim spent most his Wednesdays after school during his sophomore year with the [petitioner]. The victim would arrive at the [petitioner's] workplace and then spend time at the [petitioner's] residence before they would go to evening church activities. "And while I was at his house pretty much every Wednesday all of my sophomore year we would have sex every Wednesday at his house." The victim described this sex as him penetrating the [petitioner]. Between five and ten times, the [petitioner] would perform oral sex on the victim first in order to give the victim an erection. After the sexual encounters, the victim would "go wash up and then [they] would leave and go to the church."

4

The victim testified that he did not want to be having sex with the [petitioner], but that every time he tried to end their sexual relationship, the [petitioner] would threaten him in some way. The victim stated that the [petitioner] would bring the Computer Incident "back up" and that "every time [the victim] would pull away it was always a different threat." The victim said, "It was always something like letters would be sent to my house, I would get emails saying you should do this or you need to do that."

The sexual relationship continued into the summer following his sophomore year. At the beginning of his junior year, the victim started a job at Academy Sports in the Rivergate area in Davidson County. The victim testified that he and the [petitioner] had sex in the bathroom at the victim's job site "a couple of times." Also, when asked if he and the [petitioner] ever had sexual relations in Nashville other than at the [petitioner's] house, the victim responded, "I think its happened in my house twice."

When the victim tried to end the sexual relationship at the beginning of his junior year (the late summer/early fall of 2006), the [petitioner] told him "whatever is in the dark shall come to light." The victim became concerned that the [petitioner] would tell people at their church that the victim was a homosexual. The victim testified, "I didn't want anybody thinking I'm a homosexual . . . because I'm not. And I didn't want anybody looking at me differently because of this." The [petitioner] also claimed to have made tape recordings of voice mail messages that the victim had left him. The [petitioner] gave him a tape, which the victim destroyed after listening to it. The [petitioner] told him he had made multiple copies, however, and the victim was afraid the [petitioner] would use the tapes to convince his mother and people in the church that he was a homosexual. At about this same time, the victim's mother confiscated the victim's cell phone because of a bad report card. She found a voice mail message from the [petitioner] saying that the [petitioner] "loved [the victim] and stuff like that." T.D. confronted the victim and told him to cut all contact with the [petitioner]. The victim did not cut all contact, however, and although he told the [petitioner] about his mother hearing the voice mail, the relationship continued and moved to the victim's job site and then outside of Davidson County.

In July 2007, almost a year later, the victim finally told his mother about his relationship with the [petitioner]. They then went to the Metro

Police Department, taking a collection of e-mails and other correspondence associated with the [petitioner]. The victim answered affirmatively when asked on direct examination if "[t]he nature of those e-mails, is that the nature of the type- kind of things he would say to you basically from the beginning after he caught you looking at the pornography?" The victim also explained, "if I would make him mad, he would be like you need to do this or you need to do that or I would do this or I would do that." The victim also explained his acquiescence to the [petitioner's] demands: "I was looking for the best thing for me and my family and I feel that I did it because I was helping my family as well as [my younger brother and sister] 'cause I could see them going back to children's services . . . [a]nd so I did that for me and my mother." The victim also testified that he believed he would go to jail if he ended his relationship with the [petitioner].

On cross-examination, the victim acknowledged that he stayed with another friend of the family from church the first time his mother went out of town. He also explained that he had received e-mails from the [petitioner] that predated the ones he turned over to the police, but that he had already deleted those from his inbox. He reiterated that the first sexual incident occurred during his freshman year. He also clarified that he was sixteen years old, about to turn seventeen, when he began working at Academy Sports at the beginning of his junior year.

T.D. testified that she was a computer systems analyst and that her work began taking her out of town "frequently" during the period September 2003 through March 2004. The victim was "about 13, 14" during this time. While she was out of town, sometimes the victim stayed with T.D.'s brother and other times he stayed with the [petitioner]. She did not develop any concerns about the victim's relationship with the [petitioner] for several years. She became concerned, however, when a letter dated June 8, 2006, on State letterhead came in the mail addressed to the victim. She read the letter and, although it purported to be from a Dr. Pinnock, she became suspicious that it was actually from the [petitioner]. The letter, admitted at trial, refers to an "internet violation" made on the [petitioner's] computer by the victim and that the [petitioner's] job was thereby at risk. The letter recited that the [petitioner] had decided not to pursue the matter against the victim, but asserts that the "division/State of Tennessee still can feel the need to press charges if found necessary."

T.D. called Dr. Pinnock and confirmed that Dr. Pinnock had not written the letter. She then spoke with the [petitioner] about the letter, and

6

he told her that he suspected a coworker was responsible for it because they were upset about his high salary. She also had a conversation with the victim about the letter, and he told her about the Computer Incident and that he and the [petitioner] had spoken with Dr. Pinnock about it.

T.D. testified that she also received a letter addressed to her that was signed "B" and which claimed the victim was attending clubs while visiting his father. T.D. threw this letter out after she asked one of the victim's friends, whose name started with "B," about it and he denied having written it. She also received a letter that purported to be from a girl that the victim was dating. T.D. described the letter's contents as "crazy," and, when the victim disavowed any knowledge of why his girlfriend would write such things, they threw the letter out.

T.D. testified that she became particularly concerned about her son's relationship with the [petitioner] in October 2006, at the time the victim began working for Academy Sports. She had the victim's cell phone and listened to a voice mail that the [petitioner] left on it. She recalled that the message included the words, "you felt good last night." She spoke to the victim about it, but he explained it away. She then called the [petitioner] and threatened him "that he better stay away from my child or I would have the police over there before he knew it." The [petitioner] hung up on her and, to her knowledge, her son had no further contact with the [petitioner].

After she discovered another phone call from the [petitioner] in July 2007, she confronted the victim and he confessed his sexual relationship with the [petitioner]. T.D. testified that the victim told her the relationship started when the victim has accessed the pornographic website on the [petitioner's] computer at work. The victim told her that the [petitioner] had threatened him.

. . . .

On cross-examination, T.D. stated that, after the victim's father left the family home in July 2003, the victim saw his father on average about five or six times a year.

Dr. Theodora Pinnock testified that she was employed by the State of Tennessee Department of Health as its Director of Maternal and Child Health. The [petitioner] was under her supervision and was employed as an administrative services assistant. She recalled the victim's visiting the

7

[petitioner] at the workplace and the [petitioner's] introducing the victim to her as his godson. In May 2005, the [petitioner] told her that the victim had accessed a pornographic website on the [petitioner's] work computer. Dr. Pinnock told the [petitioner] that persons other than state employees should not be using state computers. She spoke with the victim about the incident, and he acknowledged his actions. The victim apologized and executed a notarized statement of his apology. Dr. Pinnock told the victim that the incident was then "over." The [petitioner] was not disciplined over the incident.

According to Dr. Pinnock, the [petitioner] told her that he had discovered the website visit himself. She was not aware of any "scan" of the [petitioner's] computer. Dr. Pinnock denied writing the letter dated June 8, 2006, purporting to be from her. She also denied having given the [petitioner] permission to draft the letter and denied having ever given him permission to sign her name.

Bryan Doersam, a detective with the Metro Police Department Sex Crimes Unit, testified that he investigated the instant crimes after the victim and the victim's mother came to the office in July 2007 and filed a complaint against the [petitioner]. At that time, the [petitioner] was forty-eight years old and the victim was seventeen. The victim provided Det. Doersam with numerous documents including letters and e-mail correspondence. The victim also provided voice mails from the [petitioner] that had been left on the victim's phone. In furtherance of the investigation, the victim was outfitted with a wire and then had a conversation with the [petitioner]. The conversation was recorded and monitored by Det. Doersam, who described the conversation as follows:

> The nature of that body wire conversation was [the victim] confronting [the petitioner] about this relationship; him not wanting to be a part of that; [the petitioner's] overall theme was him continuing the fact that this is your fault; [the victim], I only did these things you know, because I wanted you to be truthful with me.
>
> He admits to calling [the victim's] mother at work. He admits to having someone call his house trying to keep this relationship going. He admits to sending letters to keep –

Det. Doesam was interrupted by an objection, but later testified that, during the monitored conversation, the [petitioner] admitted that he and the victim had sex "[a]nd that he thought all this was [the victim's] fault; that the stuff with him looking at pornography at his work had kept him from getting raises, had kept him from getting promotions, that that was all [the victim's] fault." The [petitioner] also asserted that the victim was facing jail time.

The [petitioner] was subsequently taken into custody at his workplace and Detective Carrigan advised the [petitioner] of his *Miranda* rights. Det. Carrigan then walked the [petitioner] to the Criminal Justice Center, which was only a couple of blocks away. On the way, Det. Carrigan asked the [petitioner] "what he thought we were there for." The [petitioner] asked him "if it was about [the victim]." Det. Carrigan did not know the victim's identity at that time, so he replied, "tell me about [the victim]. According to Det. Carrigan, "a[t] that point, [the petitioner] started discussing his relationship with [the victim] and admitted to a sexual relationship with him." Det. Carrigan stated that he audio-recorded this conversation. Once they reached the Criminal Justice Center, they continued the interview and switched to a video recording. The video recording was played for the jury, and a transcript was provided.

During the interview, the [petitioner] admitted that, as of the time that [the victim] accessed pornography on his work computer, their sexual relationship had been ongoing for about a year. He clarified that the first time they had sex was on a Monday night during the fall of 2004 or 2005. It was [the victim's] first visit to the [petitioner's] house. He described this initial sexual contact as "his penis in me." He later stated that, on this first occasion, the victim first had anal sex with him and then he had anal sex with the victim. Their sexual relationship continued into May of the following year when the incident with the [petitioner's] work computer occurred. The [petitioner] stated that, during this interval, he and [the victim] had sex "about 30" times.

The [petitioner] explained that the victim came to stay at his house when the victim's mother was out of town. The [petitioner] stated that these visits occurred a couple of times a month. On a "couple" of occasions, the victim stayed two nights on these visits.

The [petitioner] said that the victim was lying when he claimed that the [petitioner] started their sexual relationship. According to the

9

[petitioner], the victim initiated the first sexual episode. The first episode occurred on the [petitioner's] couch, not in the spare bedroom. The [petitioner] stated that the last time he had sex with the victim at the [petitioner's] house was in October 2006.

The [petitioner] stated that the last sexual contact he had with the victim was in a hotel in Sumner County on July 7, 2007. The [petitioner] admitted that he and the victim had been to this hotel about five or six times, the first time being in January 2007. The [petitioner] explained that they moved their sexual relationship to Sumner County because the victim's mother had demanded that they stop speaking to each other. The victim had begun working at Academy Sports in Rivergate and suggested to the [petitioner] that the [petitioner] contact him at his job. The hotel was nearby. The [petitioner] would visit the victim on the victim's lunch break.

The [petitioner] stated that he performed oral sex on the victim twice over the course of their relationship. Both of these incidents occurred in Davidson County. The victim performed oral sex on the [petitioner] three or four times.

The [petitioner] admitted that he and the victim exchanged e-mail correspondence. When confronted with the documents provided by the victim, the [petitioner] acknowledged his authorship. He also admitted having written and signed the letter purportedly from Dr. Pinnock and acknowledged having sent a letter to the victim from a fictitious attorney, again reminding the victim of the Computer Incident. He sent the victim these letters in an effort to intimidate him into continuing their sexual relationship. The [petitioner] also admitted writing letters that purported to be from a girlfriend of the victim's and from a "concerned neighbor." He wrote these letters to get the victim in trouble with his mother in retaliation for the victim's lying to him. When Det. Carrigan asked,

> And then the other letters you sent on your own, and other e-mails you sent on your own were also for that same purpose of intimidating, threatening, coercing him to continue having sex with you, or else I'm coming out with all this other stuff[,]

the [petitioner] replied, "Yes."

10

The [petitioner] explained that he had taped messages that the victim had left on his voice mail and had threatened the victim with turning the tape over to the victim's mother if the victim refused to continue their relationship. He also wanted the tape to prove to the victim's mother that "this wasn't something that was started by me." The [petitioner] denied that he was interested only in continuing the sexual aspect of their relationship and averred that he had some "pretty deep feelings" for the victim.

The [petitioner] explained that he felt the victim trying to pull away from him after the Computer Incident. The [petitioner] also admitted to having become jealous when he learned that the victim was spending time with girls. The [petitioner] wanted the victim to be "faithful" to him.

. . . .

The [petitioner] also reiterated that between November 2004 and May 2005, he and the victim had sex about thirty times. Between May 2005 and June 2006, they had sex in the "general range" of one hundred times. The last time they had sex at the [petitioner's] house was in October 2006 when the victim put his penis "in" the [petitioner]. In January 2007, they started having sex in Sumner County, about once or twice a week depending on the victim's work schedule. The [petitioner] also admitted that he had sex with the victim once under a bridge near the victim's house. This episode consisted of the victim placing his penis in the [petitioner].

In addition to giving a statement, the [petitioner] consented to a search of his vehicle and home. In the [petitioner's] home, Det. Doersam found "an application for a criminal arrest warrant that was filled out and had the victim's . . . information on it." This document, admitted at trial, purports to be a form from the Juvenile Court of Davidson County. It indicates May 9, 2005 as the date of the crime, and bears the purported signatures of Shirley Hall, Deputy Clerk Notary, and Leon Ruben, Judge. The document also indicates that the [petitioner] swore the application out on May 30, 2007. The crime is described as "State property was used by [the victim] to go on the internet to view several porn websites." Also found was a letter dated January 5, 2007, addressed to the victim stating, in part,

> [t]his tape consist[s] of some love messages you left for me on either my home, work or cell phone. It seems that you will

11

never tell your mother the truth so since I'm the bad guy listen to them closely. I know you don't want your mother or friends to hear then. I have 6 more copies but the one for your mother has all of them and then some, they are all ready to be mailed unless you give me a call.

Also found in the [petitioner's] house were various items of sexual paraphernalia.

Det. Doersam testified that he asked the [petitioner] about the "tapes" but stated that the [petitioner] never produced such a tape to him. On cross-examination, Det. Doersam acknowledged that they did not have emails from 2004, 2005, or 2006, the period of time referred to in the indictment.

The victim also provided Det. Doersam with voice mail messages that the [petitioner] left on his phone in 2007. These messages were played for the jury over the defense's objection. This Court listened to these messages but found them largely unintelligible. Although the record indicates that a transcript was made of these messages and provided to the jury, the record before us does not contain such a transcript.

In addition to the [petitioner's] statement and voice messages, the trial court admitted numerous documents that the [petitioner] had admitted authoring. As set forth in more detail below, the trial court ruled that these documents were admissible after conducting a Tennessee Rule of Evidence 404(b) hearing prior to trial. The majority of these documents consisted of e-mail correspondence between the [petitioner] and the victim that took place after the alleged offenses with which the [petitioner] was charged. This e-mail correspondence from the [petitioner] to the victim includes the following excerpts:

February 1, 2007: . . . I should be your main concern trying to make me happy to a point so that I will not mail the tapes. . . . [Y]ou have a decision to make by next Wednesday, you're either going to love me truthfully or else I'll send the tape out that Thursday. I have nothing to lose. . . . Do you really realize who I'll be sending these tapes to, you'll never have a girlfriend . . . , you'll be put out [of] your mother's house and into the BIG house (jail) you don't realize the effect these tapes will cause to you and others. . . . I can't and will not

12

continue to go back and forth with you and how you feel, you're saying you love me, we have sex, you're kissing me and then you feel that we should just be friends and work our way up. . . . You have until next Wednesday to make a decision[.]

A letter attached to the February 1 e-mail including the following:

Your mother knows I will not let it die and more embarrassment will be on you all instead of me and especially with these tapes. Not only will she put you out after hearing the tape, you'll also go to jail. I haven't let anything go[,] everything is still in place. I am hating your black ass every second, minute and hour of the day. I've never hated anyone like this before that's why I need to get rid of all this hate. I know it's wrong to even hate someone so that's why this proposal is being made to you. You need to love me as you have said in the pas[t] to make me feel that way again so that I can get rid of this hate and once I do I'll give up the tapes and then walk away from it all[,] but I can't with all this hatred inside of me. I know you can do it because you do whatever you want when and how you want to do it[,] and that there's some fire still down inside of you that really loves me. As I said once I feel the love for you again I'll walk away from it all. *That Tuesday when we had sex* I was trying to see if I could feel something then but to know [sic] avail. I walked away sore for four days because I told you it had been a long time and that it would hurt. *When I feel your hard dick* I want to feel the sensation of really wanting to be with you that burning desire and *when you are up inside of me* I want to feel that you are search[ing] to hit that spot as you have before[,] but now all I can fe[e]l is hatred for you. . . . Let me say this your black ass is living on a time bomb and I don't give a damn about you . . . in the pas[t] yes, but now it's really different and you need to understand that, I'm not playing around. . . . Not only am I going to send the tape to your mother but a copy to DCS as well now you know what that will do for your mother's household. So you'll be put out and going to jail and your mother will be investigated with those two children because I have a nice letter to go in with the tape. . . . [T]here's not going to be a girlfriend at all in

13

your life if this is not solved. I will send a copy of these tapes to every girl I think you're interested in or that might be interested in you. . . . I use[d] to just sizzle with smiles when I think of the time I was taking you to Jack in the [B]ox when your dick was stiff and hard and then *we went to the house and had sex*, the time when your mother went to the Tom Joyner show early in the morning *when you bucked me on the big chair and made the both of us cum at the same time* you were ever so gentle, *the time when you had me sitting on your lap and when you finally hit that spot you had we* [sic] *screaming . . . the time when we made love* and afterwards you held me in your arms and we sleep through the night, *the time when you bucked me in my living room in the wing back chair*, *the time at the hotel when you began to undress me and you were able to get two that night within an hour and the times when you would get two or three when we would go to my house for an hour before time for you to go to the church.* . . . [Y]ou're the only one that can make this change so it's best you contact me tonight or your life will become a living hell beginning on Monday there will be three tapes that will go out on Monday[,] and I'm sure you can guess which ones they are now your mother will have to sign for hers at work or whoever is at the reception area.

March 21, 2007: . . . You lied to me about your break on Sunday which isn't the first time you lied about you[r] break. . . . I had Attorney Burt to call your manager about your break on Sunday and why you lie so I just don't know. You know you can lose your job but you w[o]n[']t have to worry about that long. . . . I can't continue trying to stop what should have been done at first and that is send your ass to jail and mail those tapes. . . . I hope you realize that you lying to me wasn't hurting me at all it was only putting yourself in danger of being put out and going to jail. . . . Oh by the way I'm up here this morning to meet with Attorney Burt at 7:30 so it's almost that time. BYE.

April 2, 2007: . . . If you really wanted to take me to the hotel that is what would have happen[ed], your interest has to be in taking me to the hotel also but not think about [your prom date] when we're together. Your interest is really not in me

14

it's about making sure that those tapes aren't mailed and you going to jail . . . Now we had better be together at the hotel Wednesday and Saturday making hot passionate love or you will not have to worry about the prom at all.

April 5, 2007: . . . I must say that I am somewhat happy today after *last night. You really put it on me in a good way it was amazing how you were able to hit it to the left and right with me riding you. Even though I had to take it out a couple of times due to the hurting but you put it back in.* Now that was making love and not just having sex. . . . I was thinking about how we would go to the house before taking you to the learning center and I would push you against the way and start taking off your clothes now *these were some good days. You were good at making us both cum when you're on top and playing in my ear with your tongue*.

March 21, 2007: . . . [Y]our time is running out. . . . I've said to you I will not be played, taken advantage of, will not put up with this as long as I have in the pas[t] and I will not lose this time around[,] I am holding to that and once the time table has come and you have not made things happen then I will walk and things will beg[i]n to happen, the tape to your mother and Attorney Burt's action.

May 20, 2007: . . . I am moving on with my life without you in it. I deserve some true happiness in my life without . . . a bunch of games of lies and deceit. I can truly say that I tried and did put my best foot forward with you and did all that I could for and with you. Now I must move on because I can't continue to try and protect you any longer[.] [Y]ou must pay for the crime you committed. . . . I'm going downtown this morning to put the next step of my plan into action. You haven't taken me serious at all in any of this but I can have the item mailed to your work address. . . .

June 17, 2007: . . . I don't care if we don't see each other again before July 2[.] [A]ll I know is if those 3 conditions are not me[]t I'll see you in court. . . . You don't think I'm going to go through with it but I can show you better than I can tell you especially after all you've done to me and how you've

15

treated me. I mean nothing to you except just a get over. We'll see in the end.

June 18, 2007: . . . What I want to feel is that I'M IN LOVE WITH YOU AND YOU'RE IN LOVE WITH ME that's all I want. I want to be happy like I was last Wednesday and you said it can happen.

June 20, 2007: . . . You show me everyday when we're apart that I'm not important in your life when with the situation at hand of you going to jail. . . . I've accepted the fact that you got me into this and I deal with it but throughout all this time we're only together for an hour 2, 3 and sometimes 4 times out of the week but can never be together outside and then how you lie and deceive me but want me to continue to be that good old crazy man and dismiss the application for warrant.

July 17, 2007: . . . Now I did call you yesterday but no more after I left work so now I take it you have told your mother that I've been calling you and God knows what else. I know you haven't told her the truth and it's a good thing I did save that message you left yesterday morning and now I can add it to the tape I have since you have destroyed yours. You talking all about religion and godly things what you did yesterday was not godly and at your mother's house, your lying is not godly so it's about whatever will benefit you but trust me it's all going to catch up with you and remember you'll be t[ur]ning 18 in October you'll be an adult.

(Emphases added). In addition to these (and other) e-mails, the [State] admitted documents include[ing] a hand-written letter dated July 17, 2007, that the [petitioner] acknowledged having written and sent to the victim's mother. It is signed with a female name and requests T.D. to "have [the victim] stop calling me" and accuses the victim of calling her "ugly names" and asking her to come to his house for sex. Also admitted was a typewritten letter dated July 18, 2007, addressed to the victim's mother and from "Concerned Neighbors." This letter claims that the authoring wife and her husband were walking in the neighborhood and saw the victim and his girlfriend "caring [sic] on in the front window ceil [sic] of your home." The author expressed concern that "that type of caring [sic] on should be in

16

the privacy of one's home and not in public view." The [petitioner] admitted that he wrote this letter in an attempt to get the victim in trouble. Detective Carrigan also testified at the trial as the State's final witness. He clarified that it was not crime to look at pornography on a state computer.

*State v. Randall Madison*, No. W2010-00059-CCA-R3-CD, 2012 WL 1589045, at *2-12 (Tenn. Crim. App. May 4, 2012) (footnotes omitted).

Based upon these facts, the petitioner was convicted of twenty-two counts of rape, three counts of aggravated statutory rape, and one count of forgery. The trial court merged the alternatively charged offenses, and convictions were entered against the petitioner for twelve counts of rape and one count of forgery. He was sentenced to an effective term of thirty-five years in the Department of Correction.

Thereafter, the petitioner filed a direct appeal with this court. On appeal, the petitioner challenged: (1) the trial court's admission of uncharged bad acts pursuant to Tennessee Rule of Evidence 404(b); (2) the State's election of offenses; (3) the sufficiency of the evidence; and (4) the sentences imposed in the case. After review, this court held that no relief from the court's 404(b) ruling was warranted, that the petitioner had failed to demonstrate that the State's election of offenses was fatally deficient, and that the evidence was sufficient. Additionally, this court affirmed the sentences as imposed. *Id*. at *1.

Subsequent to the trial in this case, the petitioner also pled guilty to charges in Sumner County involving the same victim. Trial counsel represented the petitioner in that matter as well. The petitioner presented proof at the post-conviction hearing that trial counsel had to be placed under subpoena by the court because she repeatedly missed court dates.

Thereafter the petitioner filed a pro se petition for post-conviction relief. Following the appointment of counsel, three amended petitions were filed. An evidentiary hearing was subsequently held on the matter at which trial counsel and the petitioner testified.

The petitioner testified that he retained trial counsel to represent him in both his Davidson and Sumner County cases. He testified that he gave trial counsel a cassette tape which included messages from the victim expressing his love for the petitioner, as well as his contempt for his mother. The petitioner believed that trial counsel should have used the tape to establish that the victim initiated the first sexual encounter, which led to a mutual, long-term relationship between the two. The petitioner believed that the tape was exculpatory evidence, as it would have negated the coercion or lack of consent element. He also testified that trial counsel failed to retrieve email correspondence

17

between himself and the victim from his work computer. He again claimed that the emails would have indicated the victim's willingness to engage in the sexual acts. While the petitioner was in jail at the time, he testified that he did provide trial counsel with the access code to allow her to retrieve the work emails. To his knowledge, she never accessed the emails. The petitioner did acknowledge that emails were retrieved from his personal computer and introduced into evidence. These emails included ones in which the victim expressed his love for the petitioner and the joy felt for the time they spent together.

According to the petitioner, he never wanted to go to trial in this matter. He claimed that he was open to a plea agreement, but one was never conveyed to him by trial counsel. The petitioner testified that, after trial, he learned that the State had made plea offers in his case. He testified that he would have accepted the agreement which provided for three eight-year sentences with the manner of service to be determined by the trial court. He acknowledged that trial counsel reviewed the State's discovery materials with him.

The petitioner testified that he believed that trial counsel prejudiced his case by attempting to introduce evidence of his pending cases in Sumner County. The questioning occurred during the cross-examination of a Metro detective, and trial counsel asked the detective if he was involved in the petitioner's Sumner County case. The State objected to the question, and the court sustained the objection, thus leaving the questioning unanswered. Nonetheless, no curative instruction was given.

The petitioner also testified that trial counsel failed to properly prepare his case for appeal. He alleges that she failed to include various documents in the record, which resulted in the issues being waived on appeal.

Trial counsel also testified in the matter. She indicated that she had been practicing law since 2006, almost exclusively in the criminal defense area. Trial counsel stated that she did not specifically recall any discussion of a cassette tape containing messages from the victim. She offered somewhat confusing testimony with regard to whether she actually had discussed such a tape with the petitioner. She later testified that she thought the State had provided a cassette tape to her in discovery, but she was not sure. When post-conviction counsel asked where any such tape might be, trial counsel replied that if she had had a tape, it would be with the material she turned over to post-conviction counsel. Trial counsel did recall a discussion of emails with the petitioner. She stated that she fully explored any information brought to her attention by the petitioner. She concluded that, had she found the information favorable, she most certainly would have used the evidence.

18

Trial counsel testified that she conveyed multiple plea offers to the petitioner over the course of the case. The final offer made by the State was at the conclusion of the first day of trial. Although she could not recall the exact details of the offer, trial counsel did recall that it involved eight-year sentences. She specifically testified that she relayed the information to the petitioner, and he rejected the offer.

Trial counsel testified that she did raise the issue of the Sumner County charges during her cross-examination of the detective. She recalled the State's objection being sustained following a bench conference with the trial court. No further mention was made of the Sumner County charges during the trial. She stated that she started the line of questioning as a tactical matter because so much of the evidence had come in already regarding the Sumner County events.

Trial counsel also testified that she raised and argued sentencing on appeal, although not the issue of consecutive sentencing. She did not recall this court failing to address the sentencing issue because of a failure to include a transcript. After reviewing the direct appeal opinion, she felt that this court thoroughly analyzed the sentencing issue, including review of the "proof and findings from the sentencing hearing." She did acknowledge, however, that the election of offenses and a double jeopardy claim were waived on appeal due to a failure to provide a complete record. The direct appeal opinion notes that trial counsel was given multiple opportunities to supplement the record, but it remained incomplete for review.

After hearing the evidence presented, the post-conviction court took the matter under advisement. Thereafter, the court entered a memorandum opinion denying relief to the petitioner. This timely appeal was filed.

**Analysis**

On appeal, the petitioner contends that the post-conviction court erred in denying relief because he was denied the effective assistance of counsel. Specifically, he contends that trial counsel was deficient by: (1) failing to present potentially exculpatory voicemail recordings left by the victim and potentially exculpatory emails exchanged between the victim and the petitioner; (2) failing to convey the State's plea offers to the petitioner; (3) failing to submit an adequate record on appeal causing waiver of issues; and (4) attempting to introduce evidence of the petitioner's pending Sumner County charges in a separate case. He further contends that the cumulative effect of these and other professional errors entitled him to post-conviction relief.

In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. §

19

40–30–103 (2010); *Howell v. State,* 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40–30–110(f); Tenn.Sup.Ct.R.28, § 8(D)(1); *Dellinger v. State,* 279 S.W.3d 282, 293–94 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State,* 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State,* 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State,* 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. *State v. Burns,* 6 S.W.3d 453, 461 (Tenn.1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington,* 466 U.S. 668, 685–86 (1984); *Dellinger,* 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland,* 466 U.S. at 687–88. Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

For deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 688–89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff,* 297 S.W.3d at 216 (quoting *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn.Crim.App.1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State,* 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland,* 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State,* 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Burns,* 6 S.W.3d at 462 (quoting *Strickland,* 466 U.S. at 691). "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland,* 466 U.S. at 691. "Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter,* 523 S.W.2d at 932–33.

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. In *Strickland,* the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns,* 6 S.W.3d at 461; *Grindstaff,* 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff,* 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 458 (Tenn. 2001).

In its written memorandum opinion denying the petitioner relief, the post-conviction court made the following findings:

> [The petitioner] claims that [trial counsel] . . . was deficient in all three (3) phases of her representation i.e. pretrial, trial, and appeal. Pretrial he claims that [trial counsel] failed to adequately prepare for trial by not obtaining the emails from his work computer and not conveying settlement offers. Trial deficiencies include her failure to introduce his work computer emails and the tape recordings of the victim. He also claims [trial counsel] prejudiced his defense by putting before the jury his pending Sumner

21

County case. On appeal, [the petitioner] claims [trial counsel] failed to preserve for appellate review the sentence imposed. The court will address each in this order.

**Pretrial Deficiencies**

Counsel has a duty to conduct a reasonable, independent pretrial investigation of the case in preparation for trial. *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). In this case, the Petitioner has failed to establish by clear and convincing evidence either of the pretrial claims he raises. First, the Petitioner has not established that any recordings even existed beyond the ones that were referenced at trial. The Petitioner was in jail so it is unlikely that he personally provided the alleged recording to [trial counsel]. The record shows that Detective Carrigan was unable to retrieve any such tapes either from the Petitioner or from a search of the home. . . . If they did exist, then Petitioner has the burden to produce the evidence at the hearing for the court to be able to assess whether failure to present it at trial constitutes deficient performance. Failure to do so requires the claim to be denied since the court cannot speculate as to its contents. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Moreover, assuming the tape existed and its contents were as represented, then the claim fails under the prejudice prong because this same type [of] evidence was introduced before the jury through the emails exchanged between Petitioner and the victim. The court's analysis applies equally and fully to retrieve the emails off the work computer. The issue is without merit.

The right to effective assistance of counsel applies equally to the plea negotiation process. *Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012). Obviously this constitutional mandate contemplates that any offer tendered to counsel by the prosecution be conveyed to the client. The court accredits [trial counsel] communicated whatever offer(s) may have been made. [Trial counsel] is an experienced criminal defense lawyer. The constitutional mandates aside, [trial counsel] certainly is familiar with her ethical responsibilities to the client. . . . This was a case where the State's evidence was substantial. Therefore it would behoove [trial counsel] to convey any settle[ment] offer made accompanied by her advice to accept any reasonable offer that realistically reduced Petitioner's exposure since there was little chance of prevailing at trial. She had little, if anything, to gain by forcing a case to trial when there was little likelihood of acquittal. For these reasons the court accredits the testimony of [trial counsel]. This issue is without merit.

22

**Trial Deficiencies**

[The petitioner] claims that [trial counsel] prejudiced his case by attempting to present evidence to the jury of similar charges that had been brought against him . . . in Sumner County. There is no dispute that this, in fact, happened. Regardless of whether [trial counsel] did this for tactical reasons or it was a mistake, the court finds the claim to be without merit. First, this information was already fairly raised in the evidence at trial via the Petitioner's confession. . . . Second, the answer to the question raising the Sumner County charges was never answered. There is nothing to suggest this unanswered question in any manner prejudiced Petitioner. If anything, the State's success in keeping the answer out would suggest that it would have been unfavorable to the State.

**Appellate Deficiencies**

Appellate counsel is subject to post-conviction scrutiny for deficient performance under the *Strickland* two (2)-prong standard, the same as trial counsel. In this case, Petitioner complains that [trial counsel] failed to preserve for appeal the issue of the sentence imposed by the trial court. However, a review of the record indicates this matter was fully litigated at trial and argued on the merits on appeal. . . . It is noted in the appellate decision that [trial counsel] had failed to include in the record the presentence report, the victim impact statements and the exhibits from the sentencing hearing. Likewise, this court does not have the benefit of those records. Once again, this court is not in a position to speculate as to what these documents contain and how the absence of these documents might have affected Petitioner's sentence. This issue is without merit.

For the reasons set forth herein, the Petition for Post-Conviction Relief is respectfully denied and dismissed.

As noted, the petitioner has basically raised those same issues on appeal as he did in the post-conviction court. As did the post-conviction court, we review each in turn.

**Failure to Present Cassette Tape and Work Emails**

The petitioner contends that trial counsel was ineffective by failing to present potentially exculpatory evidence in the form of a cassette tape containing voicemails left by the victim which indicated his consent to the sexual relationship. The petitioner points

to trial counsel's confusing testimony regarding the tape, especially noting that she stated that she "probably" did talk to the petitioner about the tape, although she could not specifically recall receiving such a tape. He asserts that, during her testimony, trial counsel was "evasive and argumentative when" asked whether she received such a tape. He specifically relies upon the following testimony from trial counsel to support his argument:

> [Post-Conviction Counsel]: And did [the petitioner] speak with you about a cassette tape?
> [Trial Counsel]: Probably.
> [Post-Conviction Counsel]: Okay, if he had given you a cassette tape with the victim making statements favorable to him, would you have kept it.
> [Trial Counsel]: Yes.
> [Post-Conviction Counsel]: And so if that cassette tape is nowhere to be found in the file that you gave me, would that mean that you lost it?
> [Trial Counsel]: Wait a minute, cassette tapes, I think I was given cassette tapes by the State.
> [Post-Conviction Counsel]: If there were no cassette tapes of any kind in the file that you gave me, would that mean that you lost it?
> [Trial Counsel]: No.
> [Post-Conviction Counsel]: Okay.
> [Trial Counsel]: It means that if you didn't get it, then I didn't have it.
> [Post-Conviction Counsel]: Okay so you received no cassette tapes either from the State or from . . . [the petitioner].
> [Trial Counsel]: I don't - - I know - - I don't think he gave me any cassette tapes, I think the State gave me cassette tapes or they gave me a tape, I don't know if it was a cassette tape or not.
> [Post-Conviction Counsel]: Okay, so if there were no cassette tapes in your file, would that mean you no longer have them and did not hold onto them?
> [Trial Counsel]: You got everything I had.
> [Post-Conviction Counsel]: Okay, if the State had given you a cassette tape, would you still have it?
> [Trial Counsel]: If they gave me - - no, I think you would have it, if they gave me one.
> [Post-Conviction Counsel]: If I do not have it in my files that you gave me, and one of the parties had given you a cassette tape, would that mean either you have it somewhere else and you did not turn over, possibly, or that you have lost it?
> [Trial Counsel]: I gave you everything I have.
> [Post-Conviction Counsel]: Okay, so you do not have it then?
> [Trial Counsel]: I don't have anything.

24

The petitioner contends that this testimony, at best, is slightly suspect because of the conflicts within the testimony. He claims that, at worst, the testimony indicates that trial counsel was not being forthcoming about producing the tapes for post-conviction counsel.

Similarly, the petitioner asserts that trial counsel was ineffective for failing to review and utilize potentially exculpatory emails that were exchanged with the victim on the petitioner's work computer. He claims that he was continuously incarcerated during the pendency of the case and that he was not able to examine the emails himself. He testified that, despite trial counsel's testimony that she discussed the emails with him, he had no knowledge that she ever obtained or reviewed the work emails whatsoever.

As noted above, the post-conviction court held this issue to be without merit because the petitioner failed to produce either the cassette tape or the emails at the post-conviction hearing. The petitioner contends that he should not be penalized for failing to present the tapes or emails because it was trial counsel's actions that prevented his doing so.

We agree with the post-conviction court. Pursuant to *Black v. State*, a petitioner bears the burden to produce any evidence at the post-conviction hearing for the court to be able to assess whether failure to present it at trial constitutes ineffective assistance of counsel. 794 S.W.2d 752,757 (Tenn. Crim. App. 1990). Failure to do so requires that the claim be denied since the court may not speculate as to the contents of the missing evidence.

The petitioner has not established the existence of either the tape or the work emails in his claim. While trial counsel's testimony was less than clear, she did definitively say at one point that she did not recall the petitioner giving her any cassette tapes. It was not contained in her work product which was shared with post-conviction counsel. Despite the petitioner's contentions that multiple copies were kept to send to other people, police were unable to locate any such tape in their search of the petitioner's home. With regard to the emails, there was a statement made by trial counsel, albeit not clear, that she did not recall the petitioner discussing work emails with her. Based on the ruling, it appears that the post-conviction court made a determination in favor of trial counsel's credibility. This court will not reassess such determinations. *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991).

Moreover, we also agree with the post-conviction court that, had the petitioner been able to establish the existence of such evidence, his claim still would not satisfy the prejudice prong. While everyone was in agreement that the evidence in question

25

appeared to show that the victim was willingly involved in the relationship, we note that consent is never a defense to the charge of statutory rape. *State v. McKnight*, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013). In light of all the evidence against the petitioner, including his own confession, we cannot conclude that such evidence would have changed the outcome of the trial.

**Conveyance of Settlement Offers**

Next, the petitioner contends that he was denied the effective assistance of counsel because trial counsel failed to convey a plea offer from the State, which he claims he would have accepted. He acknowledges that trial counsel testified to the contrary, stating that she did convey the offer, and the petitioner rejected it. He further acknowledges that the post-conviction court denied relief based upon a credibility determination in favor of trial counsel. However, he contends that determination was error "because there was no corroborating evidence such as a letter or recall of time and place that the offer was actually conveyed."

As noted above, it is not the province of this court to re-evaluate credibility determinations made by the trier of fact. *Mirchell*, 810 S.W.2d at 735. Questions concerning the credibility of witnesses and the weight and value of their testimony are the province of trial judges. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). The trial court is much better placed to make such determinations in light of the fact that the court is in a position to both hear the testimony and observe the witness when the testimony is presented.

The petitioner's argument that we should re-evaluate a credibility determination because there is no evidence to support it is misplaced. As noted by the post-conviction court, this was a complicated case with substantial evidence against the petitioner. It would not in any way have benefitted trial counsel to fail to convey a settlement offer. The petitioner has put forth no evidence which preponderates against the findings of the post-conviction court.

**Failure to Prepare an Adequate Appellate Record**

Next, the petitioner contends that trial counsel was deficient for failing to present an adequate record for review on direct appeal, which resulted in issues being waived. Specifically, he contends that she failed to include a transcript of the jury charge or the closing arguments, which precluded this court from addressing the election of offenses and double jeopardy issues on appeal. He also alleges that trial counsel failed to produce an adequate appellate record regarding the sentencing aspect of the appeal, noting that

trial counsel failed to include the sentencing hearing exhibits, the pre-sentence report, and the victim's statement. Although acknowledging that the court did address his sentence, the petitioner contends that the failure to include the above mentioned items rendered this court's review of the issue incomplete on direct appeal.

As an initial matter, we point out that there is no dispute that trial counsel did in fact fail to include certain documents in the record. The direct appeal opinion specifically notes that the record remained incomplete after trial counsel was afforded multiple chances to supplement the record. *Randall Kelvin Madison*, 2012 WL 1589045, at *24 n.12, 28 n.13. This court did in fact waive review of the issues of double jeopardy and election of offenses. *Id.* at *20, 24. The opinion does indicate that the length of the petitioner's sentence was thoroughly reviewed. *Id.* at *28-32.

Turning to review of the post-conviction court's determination, we must point out that the petitioner failed to challenge the completeness of the appellate record with regard to the double jeopardy or election of offenses in his original or amended petitions for post-conviction relief. The only reference made to trial counsel's performance on appeal is contained in the third amended post-conviction petition and states: "[Trial Counsel] failed to request a transcript of Petitioner's sentencing hearing to be prepared and as a result the Court of Criminal Appeals did not review the issue of his sentence. Her failure caused this issue to be waived." The post-conviction transcript does indicate that the petitioner asked some questions regarding the double jeopardy and election of offense issues at the post-conviction hearing, but the post-conviction court made no rulings on the issue.

Because the issue was not before the post-conviction court and no ruling was rendered, we are precluded from review. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. *Jimmy Earl Lofton v. State*, No. 02C01-9603-CR-00073 (Tenn. Crim. App. Mar. 7, 1997); *see also Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) (an issue raised for the first time on appeal is waived). A post-conviction petition "must necessarily rest upon and be determined by the factual allegations it contains." *Lang v. State*, 510 S.W.2d 83, 85 (Tenn. Crim. App. 1974), As such, the petitioner has waived review of this issue.

Additionally, even had the issue been raised, the petitioner would still not be entitled to relief. In order to establish ineffective assistance of counsel involving appellate issues, a petitioner is required to establish that, had the issues been properly raised and addressed, relief would have been warranted. *Carpenter v. State*, 126 S.W.3d 879, 887-88 (Tenn. 2004) (citing *United States v. Dixon*, 1 F.3d 1080, 1083 (10th Cir. 1993)). Absent such a finding, the petitioner will be unable to establish prejudice.

27

In this case, the petitioner has not established that he would have been successful on appeal had the documents been included. In fact, we cannot review the issue to make such a determination because the petitioner failed to include any of the items which he claimed were omitted from the appellate record on direct appeal. Additionally, no legal authority is cited to support his claim that the issues are meritorious. By failing to include the documents in this record, the petitioner has essentially waived the issue. *See Black*, 794 S.W.2d at 757.

The petitioner's assertion with regard to his sentencing issue is likewise waived for the same reason. While it is clear that trial counsel did not include certain evidence in the record with regard to sentencing, the petitioner likewise failed to introduce it at the post-conviction hearing. Thus, he cannot establish that he was prejudiced by trial counsel's failure to include the evidence on direct appeal. *Id.* Without the documents, he cannot establish that the court would have imposed a different sentence had the documents been before this court on direct appeal.

Moreover, as found by the post-conviction court, the record indicates that the matter of sentencing was fully litigated at trial and argued on appeal. Despite the lack of certain pieces of evidence, this court thoroughly analyzed the sentences imposed by the trial court. Nothing in this record preponderates against that finding.

**Introduction of Sumner County Charges**

As his final contention, the petitioner contends that trial counsel's above-described errors combined with "other prejudicial errors and omissions, including her uncooperativeness and evasiveness in the litigation of this petition, render[s] her representation . . . ineffective." His argument, however, centers around the fact that trial counsel "intentionally and inexplicably referenced his pending similar charges . . . in Sumner County during the trial of this matter." He notes that trial counsel "finally admitted that the trial court . . . had to intercede to 'protect the interests' of the petitioner" at trial. He claims it was not a strategic decision on trial counsel's part despite her testimony that she initiated the line of questioning because the State had "already brought up everything that happened in Gallatin." The petitioner characterizes trial counsel's actions as feeling "the need to draw yet more attention to the fact that the [petitioner] had outstanding similar charges in another jurisdiction." The petitioner also encourages this court to note that the record in this case demonstrates trial counsel's "incompetence and/or disinterest in the case." He directs the court's attention to the fact that the trial court in the Sumner County case issued a subpoena for her presence because she missed court dates and ignored messages from the court. He contended this is "not indicative of zealous representations or forthright professional behavior."

In support of his argument, the petitioner has included a copy of the transcript from that portion of the trial. It reads as follows:

Q.     Detective - -
A.     Yes, ma'am.
Q.     Are you the one that contacted the Sumner Police Department in Gallatin?
A.     Actually it was Hendersonville.
Q.     What - - Hendersonville?
A.     Yes, ma'am.
Q.     Did you go and testify before the grand jury there that resulted in his - -

General . . . : Judge, may we approach?
The Court:     Okay
(Bench conference outside the hearing of the jury).
General . . . : (Inaudible) inquire as to (inaudible) specifically what he's charged with and (inaudible).
The Court: (Inaudible.)
[Trial Counsel]: We have practically tried the whole Gallatin case here, every e-mail, everything - -
The Court: That's not accurate. Give me a break. Do you want to bring this up? Do you want to ask (inaudible)?
[Trial Counsel]: Your Honor, every incident that occurred and every e-mail - -
The Court: Does anyone know on this jury that there's any other charges in any other county?
[Trial Counsel]: Well, Your Honor - -
The Court: Did they?
[Trial Counsel]: I don't know
The Court: Are you serious?
[Trial Counsel]: You asked me. I don't know what they know.
The Court: Did anybody mention anything about charges in another county? (inaudible).
[Trial Counsel]: Your Honor - -
The Court: Have they? Have they?
[Trial counsel]: - - the trial has not been going on that long.
The Court: So can you remember whether anybody said anything about any charges (inaudible)?
[Trial Counsel]: Your Honor, I'm just saying - -
The Court: Have they?
[Trial Counsel]: I - -

29

The Court: Have they?

[Trial Counsel]: - - don't think so.

The Court: Then do you want to?

[Trial Counsel]: To put this in perspective - -

The Court: Do you want to?

[Trial Counsel]: Your Honor - -

The Court: Why are you wanting to ask him questions?

[Trial Counsel]: Because, Your Honor, they have brought in everything that happened in Gallatin.

The Court: It's not in Gallatin.

[Trial Counsel]: I don't want the jury to be confused and think that the Gallatin charges are these charges and try the Gallatin case here.

The Court: So you want to bring it up?

[Trial Counsel]: I want them to know he's been charged in Gallatin.

The Court: I'm going to protect your client's interest and sustain the objection.

As noted by the post-conviction court, there is no dispute that trial counsel did in fact attempt to put evidence of the other charges before the jury. Nonetheless, the court noted that whether "for tactical reasons or . . . a mistake," the issue was without merit because the evidence of the Sumner County charges was fairly raised in the evidence via the petitioner's confession and because the question asked by trial counsel was never answered. The court thus concluded that no prejudice resulted to the petitioner. We agree.

As the post-conviction court found, it is not necessary to our review to determine whether trial counsel was deficient in attempting to elicit information about the Sumner County pending charges. Trial counsel indicated that it was a strategic decision to make sure that the jury did not confuse the two cases "and try the Gallatin case here" because of the extensive proof which was presented regarding the separate charges. While normally it would not be good practice to elicit such information, we need not make such a determination in this case. *See Strickland*, 466 U.S. at 697.

The petitioner has simply failed to establish that he was prejudiced by trial counsel's question to the detective. Even had the detective actually answered the question before the State's objection, the jury was already aware of the conduct by the petitioner which occurred in Sumner County. Because the question was never answered, moreover, the jury never actually knew that charges were pending based upon that behavior. The petitioner's confession itself detailed the incidents, and the victim's testimony confirmed the accounts. In light of this and the overwhelming evidence of the

petitioner's guilt, we cannot conclude that the petitioner was prejudiced by trial counsel's attempt to question the detective in this manner.

As an aside, the petitioner asks us to consider trial counsel's poor performance in the Sumner County case, including the fact that she had to be placed under subpoena to appear in court. However, that is not relevant to our determination of prejudice in this case. That is a separate case that was resolved after this case.

Based upon the findings above, the petitioner's assertions with regard to cumulative error entitle him to no relief. We affirm the judgment of the post-conviction court.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE